**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| MEGATEL HOMES, LLC, MEGATEL HOMES II, LLC, and MEGATEL HOMES III, LLC | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Civil Action No. _____ |
| MEHRDAD MOAYEDI, UNITED DEVELOPMENT FUNDING, L.P., UNITED DEVELOPMENT FUNDING II, L.P., UNITED DEVELOPMENT FUNDING III, L.P., UNITED DEVELOPMENT FUNDING IV, UNITED DEVELOPMENT FUNDING INCOME FUND V, UMT SERVICES, INC., UMT HOLDINGS, L.P., HOLLIS GREENLAW, THEODORE F. ETTER, BENJAMIN WISSINK, and BRANDON JESTER | § § § § § § § § § § § § § § | |
| *Defendants*. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Megatel Homes, LLC, Megatel Homes II, LLC, and Megatel Homes III, LLC (collectively "Megatel") file this Original Complaint against Defendants Mehrdad Moayedi, United Development Funding, L.P., United Development Funding II, L.P. ("UDF II"), United Development Funding III, L.P. ("UDF III"), United Development Funding IV ("UDF IV"), United Development Funding Income Fund V ("UDF V"),  UMT Services, Inc. ("UMT Services"), UMT Holdings, L.P. ("UMT Holdings"), Hollis Greenlaw, Theodore F. Etter, Benjamin Wissink, and Brandon Jester, and in support thereof would respectfully show the following:

## I.     INTRODUCTION

1.     This case concerns a protracted and multi-faceted scheme to defraud Megatel, which provided collateral support for and concealment of a separate Ponzi-like scheme involving hundreds of millions of dollars and manifold real estate development projects across North Texas.

2.     In 2003, Defendants Greenlaw and Etter founded United Development Funding, L.P., which is an investment fund focused on providing financing for residential development projects.  From 2003 to 2014, Greenlaw and Etter created several related funds, including UDF II, UDF III, UDF IV, and UDF V, managed, in part, by both UMT Services and UMT Holdings (collectively "UDF").  The UDF business model was straightforward—a UDF fund would raise capital from investors and low-interest bank loans and then lend that capital to land developers and homebuilders at interest rates that exceeded the UDF funds' cost of capital.

3.     From its inception, some of UDF's largest borrowers were Centurion American Custom Homes d/b/a Centurion American Development Group and its various affiliated entities (collectively "Centurion"), which are land development companies founded, operated, and controlled by Defendant Moayedi.  Indeed, at one point, loans to Centurion constituted more than half of the outstanding loan portfolios of UDF III and UDF IV.

4.     By 2009, Megatel had established itself as one of the premier homebuilders in the State of Texas, and Centurion frequently contracted with Megatel to serve as a primary builder on land development projects predominately financed by UDF.

5.     Prior to 2015, Megatel perceived its relationship with Centurion and UDF to be incredibly successful and lucrative.  Unbeknownst to Megatel, however, by 2011, UDF and Centurion had become cash starved as a result of the Great Recession, and Moayedi and the UDF Defendants surreptitiously and behind closed-doors schemed to keep themselves afloat.

6.      To prevent the collapse of Centurion, Moayedi needed cash to fend off widespread foreclosure, and Megatel proved to be a handy target.  First, Moayedi fraudulently induced Megatel to enter into multiple real estate contracts and amendments and fraudulently obtained a significant amount of earnest money and other benefits from Megatel that he diverted to other ventures and loan repayments.  Second, Moayedi engineered bogus terminations of Megatel contracts (using backdated and forged documents) when the opportunity to sell on more favorable terms to Megatel's competitors presented itself. Third, Moayedi looted public funding from projects in which Megatel participated and diverted that funding to other projects and loan repayments.

7.      For its part, UDF began operating as a Ponzi-like scheme, using freshly-raised capital in newer funds to pay investors in older funds.  To implement this scheme, a newer UDF fund (e.g. UDF V) would loan money to Centurion—ostensibly for a specific land-development project—that Centurion would use to repay loans it had received from an older UDF fund (e.g. UDF III).  The older UDF fund, in turn, used this money to pay distributions to its investors, thereby concealing the failure of the loans made by the older fund.  Each new loan originated from a newer fund to pay an older fund generated millions of dollars in asset management and origination fees for the UDF Defendants, which starved the funding for development projects for which Megatel had contracted.

8.      To continue raising money for newer UDF funds, UDF needed to show investors that it was going to deploy their capital into promising development projects that would provide the investors with a return on their investments.  Accordingly, a significant portion of the money UDF loaned to Centurion was earmarked for projects in which Megatel participated, and Centurion's contracts with Megatel were used as collateral to secure these loans, used in reappraising the property's value and increasing the loan amount, and as evidence for UDF

investors that UDF loans were being made to finance legitimate development projects. Although UDF and Centurion intended from the outset to use loans from newer UDF funds to repay loans from older funds, Moayedi repeatedly induced Megatel to enter into development contracts and amendments with false representations regarding Centurion's intent and ability to hit various development benchmarks and develop new projects. Because Centurion was not using, and never intended to use, loans from newer UDF funds to advance these projects, however, many of the projects languished, leading to significant delays in the delivery of developed lots to Megatel and, in some cases, a complete failure by Centurion to deliver on the promises it and Moayedi had made to Megatel.

9.     In sum, Moayedi and UDF had independent incentives to prop each other up and to facilitate their separate schemes. And they did so, in part, by conspiring to defraud Megatel, which stood at the intersection of the two frauds. Together, Defendants syphoned hundreds of millions of dollars off loans intended for the development of projects for which Megatel had contracted for their own personal enrichment.

10.     The house of cards eventually collapsed, resulting in an FBI raid, an SEC settlement, and class-action litigation by UDF's investors. Megatel now brings this lawsuit to recover the substantial damages it has suffered as a result of the Defendants' protracted pattern of systemic fraud and deception.

## II.     PARTIES

11.     Plaintiff Megatel Homes, LLC (f/k/a Megatel Homes, Inc.) is a limited-liability company organized under the laws of the State of Texas. Its principal place of business is located at 1800 Valley View Lane, Suite 400, Farmers Branch, Texas 75234.

12.     Plaintiff Megatel Homes II, LLC is a limited-liability company organized under the laws of the State of Texas.  Its principal place of business is located at 1800 Valley View Lane, Suite 400, Farmers Branch, Texas 75234.

13.     Plaintiff Megatel Homes III, LLC is a limited-liability company organized under the laws of the State of Texas.  Its principal place of business is located at 1800 Valley View Lane, Suite 400, Farmers Branch, Texas 75234.

14.     Defendant Mehrdad Moayedi is a Texas citizen and the principal of Centurion.  His business address is 1800 Valley View Lane, Suite 300, Farmers Branch, Texas 75234.  Moayedi conducted the affairs of the Centurion Enterprise through a pattern of racketeering.

15.     Defendant United Development Funding L.P. is a Delaware limited partnership with its principal place of business located at 1301 Municipal Way, Suite 200, Grapevine, Texas 76051.

16.     Defendant United Development Funding II, L.P. is a Delaware limited partnership with its principal place of business located at 1301 Municipal Way, Suite 200, Grapevine, Texas 76051.

17.     Defendant United Development Funding III, L.P. is a Delaware limited partnership with its principal place of business located at 1301 Municipal Way, Suite 200, Grapevine, Texas 76051.

18.     Defendant United Development Funding IV is a Maryland real estate investment trust with its principal place of business located at 1301 Municipal Way, Suite 200, Grapevine, Texas 76051.

19.     Defendant United Development Funding Income Fund ("UDF V") is a Maryland real estate investment trust with its principal place of business located at 1301 Municipal Way, Suite 200, Grapevine, Texas 76051.

20.     Defendant UMT Services, Inc. is a Delaware corporation with its principal place of business located at 1301 Municipal Way, Suite 200, Grapevine, Texas 76051.

21.     Defendant UMT Holdings, L.P. is a Delaware limited partnership with its principal place of business located at 1301 Municipal Way, Suite 200, Grapevine, Texas 76051.

22.     Defendant Hollis Greenlaw is a founder and principal of UDF.  His business address is 1301 Municipal Way, Suite 200, Grapevine, Texas 76051. Greeenlaw, acting in concert and coordination with Moayedi and the other RICO Defendants, engaged in wrongful conduct at issue in this case.

23.     Defendant Theodore "Todd" F. Etter is also a founder and principal of UDF.  His business address is 1301 Municipal Way, Suite 200, Grapevine, Texas 76051.  Etter, acting in concert and coordination with Moayedi and the other RICO Defendants, engaged in wrongful conduct at issue in this case.

24.     Defendant Benjamin Wissink is a principal and officer of UDF.  His business address is 1301 Municipal Way, Suite 200, Grapevine, Texas 76051.  Wissink, acting in concert and coordination with Moayedi and the other RICO Defendants, engaged in wrongful conduct at issue in this case.

25.     Defendant Brandon Jester is an officer of UDF.  His business address is 1301 Municipal Way, Suite 200, Grapevine, Texas 76051.  Jester, acting in concert and coordination with Moayedi and the other RICO Defendants, engaged in wrongful conduct at issue in this case.

### III.    JURISDICTION

26.     The jurisdiction of this Court is founded on 18 U.S.C. § 1964 and 28 U.S.C. §§ 1332, 1367(a).

### IV.    VENUE

27.     Venue is appropriate in this District because all defendants are residents of the State of Texas; alternatively, venue is appropriate in this Court because "a substantial part of the events or omissions giving rise" to the Plaintiffs' claims occurred in this District.  *See* 28 U.S.C. § 1391(b).

### V.    CULPABLE PERSONS

28.     Each defendant is "capable of holding a legal or beneficial interest in property," and therefore is a "person" within the meaning of 18 U.S.C. § 1961(3).

### VI.    THE ENTERPRISE

29.     The Centurion Enterprise is comprised of Centurion American and its affiliates and subsidiaries.  It is therefore an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

30.     Both the activities of the enterprise and the predicate acts of racketeering affect interstate commerce, as the defendants have used mail, wires, and other instrumentalities of interstate commerce as detailed herein.

### VII.    RACKETEERING ACTIVITY

31.     Moayedi, in concert with the other defendants, conceived a scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representations, or promises.

32.     Moayedi, in concert with the other defendants, executed this scheme by making dozens of misrepresentations and omissions facilitated by—and sometimes contained within—hundreds of mail and wire communications in violation of 18 U.S.C. §§ 1341 and 1343.

33.     Moayedi, in concert with the other defendants, also transported and/or received in interstate commerce more than $5,000 that was stolen, converted or taken by fraud in violation of 18 U.S.C. § 2314.

34.     Moayedi's misrepresentations and omissions took four forms.  First, Moayedi entered into contracts with Megatel that he had no intention of performing.  Second, he made misrepresentations to Megatel in the course of performance.  Third, he made misrepresentations to government authorities.  Fourth, he forged and backdated documents.

35.     By way of example, the following non-exhaustive list of predicate acts (labelled with the name of the associated development project) were undertaken intentionally and effectuated by use of a mailing or an interstate wiring:

a.     Shahan Prairie Predicate Act 1 – On or about February 28, 2014, Moayedi caused Shahan Prairie, L.P.—an instrumentality of the Centurion Enterprise—to enter into a Contract of Sale with Megatel Homes III, wherein it represented to Megatel Homes III that it would "diligently pursue to Completion . . . the development and construction of improvements" specified in the Contract of Sale.  In addition, Moayedi caused Shahan Prairie, L.P. to represent to Megatel Homes III that completion of the development and construction of improvements would be accomplished on or prior to 12 months after the date of the Contract for Sale.  These representations were false and fraudulent because, at the time they were made, Moayedi had no intention of performing, or alternatively, knew he was incapable

of doing so. Moayedi's intention in making this false representation was to fraudulently induce Megatel III into the Contract of Sale, so that Shahan Prairie L.P. could show an increased potential value for the purported Shahan Prairie development and thereby obtain additional financing from UDF III.

b.  Shahan Prairie Predicate Act 2 – On June 2, 2014, Moayedi fraudulently induced Megatel III to enter into an amendment to the Contract of Sale to increase the number of lots in the purported Shahan Prairie development that Megatel III would be obligated to purchase upon completion. In the amendment, Moayedi reaffirmed the false and fraudulent promises made in the initial Contract of Sale. In doing so, he made an additional false and fraudulent representation of fact. Moayedi's intention in making this false representation was to induce Megatel III to enter into the amendment, so that Shahan Prairie, L.P. could show an increased potential value for the purported Shahan Prairie development and thereby obtain additional financing from UDF V that it would ultimately use to repay loans from UDF III.

c.  Shahan Prairie Predicate Act 3 – In 2016, Moayedi sent Megatel III a fraudulent notice cancelling the Contract of Sale. The fraudulent notice was backdated and without any legal basis. After sending the fraudulent cancellation notice, Moayedi caused Shahan Prairie, L.P. to sell the lots that Megatel III was going to purchase to one of Megatel's competitors.

d.  Riverwalk Predicate Act 1 – On April 6, 2015, Moayedi caused CADG Riverwalk—an instrumentality of the Centurion Enterprise—to enter into the Riverwalk Contract with Megatel Homes III. In Section 7(c)(i)(A) of the Riverwalk Contract, Moayedi and CADG Riverwalk represented to Megatel that they intended

to transfer lots to Megatel "free and clear of all liens and encumbrances except" those specifically set forth in the contract.  That representation was false and fraudulent because the contract did not include certain onerous restrictive covenants Moayedi had granted to a third party.

e.    Riverwalk Predicate Act 2 – In Section 9(a)(1) of the Riverwalk Contract, Moayedi and CADG Riverwalk warranted that they had complied with "all applicable laws, ordinances, regulations and restrictions related to the Lots."  That representation was false and fraudulent because Moayedi had transferred the lots in a manner inconsistent with the requirements of the contract; that is, he had transferred the lots fraudulently and subject to undisclosed restrictive covenants.

f.    Riverwalk Predicate Act 3 – In Section 9(a)(5)(A) of the Riverwalk Contract, Moayedi and CADG Riverwalk represented that "there [were] no unpaid charges, liabilities, or obligations arising from the construction, ownership, or operation of the Lots which could give rise to any mechanic's or materialmen's or other statutory lien against the Lots, or for which Purchaser will otherwise be responsible."  That representation was false and fraudulent because ownership of the Lots gave rise to "liabilities" and "obligations" arising out of the restrictive covenants and Moayedi knew as much.

g.    Riverwalk Predicate Act 4 – In Section 9(a)(5)(D) of the Riverwalk Contract, Moayedi and CADG Riverwalk represented that "performance of this Contract will not result in any breach of, or constitute any default under, or result in the imposition of any lien or encumbrance upon the Lots under any agreement or other instrument to which Seller or the Lots might be bound."  That representation was

false and fraudulent because Moayedi knew that performance of the contract could potentially result in the "imposition of . . . [an] encumbrance" due to the presence of the restrictive covenants.

h.  Riverwalk Predicate Act 5 – Upon information and belief, Moayedi covertly diverted millions of dollars of proceeds from both Megatel and from government EB-5 funds earmarked for the Riverwalk development to other development projects.  This fraudulent diversion of development funds caused substantial delays in the project and substantial damages to Megatel.

i.  Kensington Gardens Predicate Act 1 – Between July 2012 and December 2017, Moayedi made numerous false and fraudulent representations to Megatel concerning his progress toward completion of the Kensington Gardens development.  These false representations took the form of false representations of existing facts—facts about what work he had actually done to advance development—and false promises concerning the timeline of completion. Moayedi's intention in making these false and fraudulent representations was to induce Megatel to forgo its contractually guaranteed right to terminate the agreement upon Moayedi's default.

j.  Kensington Gardens Predicate Act 2 – In 2017, Moayedi caused various engineering documents to be forged to certify that all lots to be acquired by Megatel in the Kensington Gardens development satisfied the FEMA Base Flood Elevation ("BFE") requirements.  In fact, Moayedi knew that approximately 30 lots in the development did not satisfy the FEMA BFE requirements.  Moayedi's intention in causing the falsification of the engineering documents was to induce Megatel into

purchasing various lots in the Kensington Gardens development. Megatel did purchase multiple lots in the development and has since been denied necessary building permits from the City of Dallas because the lots do not satisfy the FEMA BFE requirements.

k.   Lakes of Prosper Predicate Act 1 – On January 22, 2013, Moayedi fraudulently induced Megatel into the Lakes of Prosper Contract by representing that Moayedi would achieve substantial completion by September 1, 2013. That representation was false and fraudulent because, at the time it was made, Moayedi had no intention of performing. Moayedi's intention in making this misrepresentation was to fraudulently induce Megatel to enter into the Lakes of Prosper Contract.

l.   Lakes of Prosper Predicate Act 2 – On January 22, 2013, Moayedi fraudulently induced Megatel's entry into the Lakes of Prosper Contract by representing that he would construct an amenity center in a timely fashion. That representation was false and fraudulent because, at the time it was made, Moayedi had no intention of performing. Moayedi's intention in making this representation was to effectuate his scheme to fraudulently induce Megatel to enter into the Lakes of Prosper Contract.

m.   Lakes of Prosper Predicate Act 3 – Over the next four years, Moayedi was in persistent contact with Megatel concerning the Lakes of Prosper development. In those communications, Moayedi—either directly or through his agents— consistently represented to Megatel that CADG Prosper Lakes North had made substantial progress toward timely completion of the development and of the amenity center and made representations concerning when development would be

complete.  These representations were false and fraudulent because, at the time they were made, Moayedi had no intention of performing.  They were also false and fraudulent because they constituted false representations of prior facts, in particular those facts concerning the progress made on the development.

n.  Lakes of Prosper Predicate Act 4 – In 2014, Moayedi sent Megatel a letter by certified mail in which he represented that he would begin to construct the amenity center in the first quarter of 2015, such that it would be ready during the summer swimming season.  This representation was false and fraudulent because, at the time it was made, Moayedi had no intention of performing.  Moayedi's intention in making this fraudulent representation was to induce Megatel to forgo their contractually guaranteed right to terminate the agreement.

o.  Preston Hills Predicate Act 1 – On May 15, 2014, Moayedi caused CTMGT Frisco 113—an instrumentality of the Centurion Enterprise—to enter into the Preston Hills Contract with Megatel Homes III.  In the contract, Moayedi caused CTMGT Frisco 113 to represent to Megatel that it would "diligently pursue to [c]ompletion" the lots contained in Phase I such that they would be completed by June 23, 2015.  That representation was false and fraudulent because, at the time it was made, Moayedi had no intention of performing.

p.  Preston Hills Predicate Act 2 – On May 15, 2014, Moayedi caused CTMGT Frisco 113 to represent to Megatel that it would "diligently pursue to [c]ompletion" the lots contained in Phase II such that Phase II construction would begin after the completion of the third lot takedown and be completed a year after construction

occurred.  That representation was false and fraudulent because, at the time it was made, Moayedi had no intention of performing.

q.   Preston Hills Predicate Act 3 – On May 15, 2014, Moayedi caused CTMGT Frisco 113 to represent to Megatel that it would deliver an "operational" and complete amenity center no later than June 1, 2016.  This representation was false and fraudulent because, at the time it was made, Moayedi had no intention of performing.

r.   Preston Hills Predicate Act 4 – On June 23, 2014, Moayedi caused CTMGT Frisco 113 to enter into the First Amendment to the Preston Hills Contract with Megatel Homes III.  In the First Amendment, Moayedi reaffirmed the false and fraudulent promises made in the initial contract.  In doing so, he made an additional false and fraudulent representation of fact.

s.   Preston Hills Predicate Act 5 – On September 30, 2015, Moayedi caused CTMGT Frisco 113 to enter into the Second Amendment to the Preston Hills Contract with Megatel Homes III.  In the Second Amendment, Moayedi reaffirmed the false and fraudulent promises made in the initial contract.  In doing so, he made an additional false and fraudulent representation of fact.

t.   Preston Hills Predicate Act 6 – On December 27, 2015, Moayedi caused CTMGT Frisco 113 to enter into the Third Amendment to the Preston Hills Contract with Megatel Homes III.  In the Third Amendment, Moayedi reaffirmed the false and fraudulent promises made in the initial contract.  In doing so, he made an additional false and fraudulent representation of fact.

u.  Preston Hills Predicate Act 7 – On May 18, 2016, Moayedi caused CTMGT Frisco 113 to enter into the Fourth Amendment to the Preston Hills Contract with Megatel Homes III.  In the Fourth Amendment, Moayedi reaffirmed the false and fraudulent promises made in the initial contract. In doing so, he made an additional false and fraudulent representation of fact.

v.  Preston Hills Predicate Act 8 – On June 17, 2016, Moayedi caused CTMGT Frisco 113 to enter into the Fifth Amendment to the Preston Hills Contract with Megatel Homes III.  In the Fifth Amendment, Moayedi reaffirmed the false and fraudulent promises made in the initial contract.  In doing so, he made an additional false and fraudulent representation of fact.

w.  Preston Hills Predicate Act 9 – In July of 2016, Moayedi caused CTMGT Frisco 113 to enter into the Sixth Amendment to the Preston Hills Contract with Megatel Homes III.  In the Sixth Amendment, Moayedi reaffirmed the false and fraudulent promises made in the initial contract.  In doing so, he made an additional false and fraudulent representation of fact.

x.  Preston Hills Predicate Act 10 – Throughout the course of the development of the lots in Preston Hills, Moayedi made a series of false and fraudulent representations to Megatel concerning CTMGT Frisco's progress.  These representations were false and fraudulent both because they constituted false representations of present facts and also constituted false promises with respect to future performance.  These fraudulent representations were made in order to induce Megatel to forgo their contractually guaranteed right to terminate the contract upon Moayedi's default.

y.   Creeks of Legacy Predicate Act 1 – On August 12, 2014, Moayedi caused CTMGT Frontier 80—an instrumentality of the Centurion Enterprise—to enter into the Creeks of Legacy Contract with Megatel Homes III.  In the contract, Moayedi caused CTMGT Frontier 80 to represent to Megatel that it would timely complete an amenity center for Phase I.  That representation was false and fraudulent because, at the time it was made, Moayedi had no intention of performing.

z.   Creeks of Legacy Predicate Act 2 – Under the Creeks of Legacy Contract, CTMGT Frontier 80 was entitled to charge Megatel an increased purchase price and interest on lots in the development only if the amenity center was timely completed.  Over the following four years, Moayedi made numerous representations to Megatel concerning CTMGT Frontier 80's progress toward completion of the amenity center and the date when it would be ready.  These representations were false and fraudulent because they constituted false representations of existing facts—facts about what work Moayedi had done—and false promises concerning future performance.  Moayedi made these false representations in order to fraudulently charge Megatel increased prices for lots in the development and interest charges that he was not entitled to charge because of his failure to timely complete the amenity center.

aa.   Creeks of Legacy Predicate Act 3 – On October 17, 2018, Moayedi caused a fraudulent notice of default to be sent via certified mail to Megatel.  The notice of default was fraudulent because it purported to lay blame for delays on Megatel when Moayedi knew that he was the one deliberately delaying completion.  The

notice was issued in order to deny Megatel the opportunity to recoup its earnest money.

bb.  Creeks of Legacy Predicate Act 4 – On December 14, 2018, Moayedi caused a wrongfully issued notice of termination to be sent via certified mail to Megatel, thereby causing Megatel to lose 45 lots to which it was entitled and $1,300,000 in earnest money.  The notice of termination was false and fraudulent because it asserted that Megatel had defaulted when, in fact, Moayedi knew that he had intentionally defaulted.

cc.  University Place Predicate Act 1 – On March 6, 2015, Moayedi caused CADG Dallas 163—an instrumentality of the Centurion Enterprise—to enter into the University Place Contract with Megatel Homes III. In that agreement, Moayedi caused CADG Dallas 163 to represent to Megatel that it "would proceed diligently and promptly with development" of University Place.  That representation was false and fraudulent because, at the time it was made, Moayedi had no intention of performing.

dd.  University Place Predicate Act 2 – In the March 6, 2015 University Place Contract, Moayedi caused CADG Dallas 163 to promise to Megatel it would build an amenity center in a timely and correct manner.  That representation was false and fraudulent because, at the time it was made, Moayedi had no intention of performing.

ee.  University Place Predicate Act 3 – In negotiations leading up to the March 6, 2015 University Place Contract, Moayedi represented to Megatel that the development would be completed mere months after the earnest money was deposited.  That

representation was false and fraudulent because, at the time it was made, Moayedi had no intention of performing.

ff.   University Place Predicate Act 4 – On April 26, 2016, Moayedi caused CADG Dallas 163 to enter into the First University Place Amendment.  That amendment includes a ratification clause in which Moayedi caused CADG Dallas 163 to affirm that all representations in the prior iteration of the contract remained valid.  In falsely reaffirming the validity of his false and fraudulent promises, Moayedi made an additional false and fraudulent representation of fact.

gg.   University Place Predicate Act 5 – On July 13, 2017, Moayedi caused CADG Dallas 163 to enter into the Second University Place Amendment.  That amendment includes a ratification clause in which Moayedi caused CADG Dallas 163 to affirm that all representations in the prior iteration of the contract remained valid.  In falsely reaffirming the validity of his false and fraudulent promises, Moayedi made an additional false and fraudulent representation of fact.

hh.   Mercer Crossing – Kensington Predicate Act 1 – On October 5, 2017, Moayedi caused CADG Mercer MM Holdings—an instrumentality of the Centurion Enterprise—to represent to Megatel in the First Mercer Crossing – Kensington Contract that CADG Mercer MM Holdings would "proceed diligently and promptly with development of the lots" in the development.  That representation was false and fraudulent because, at the time it was made, Moayedi had no intention of performing.

ii.   Mercer Crossing – Kensington Predicate Act 2 – On February 28, 2019, Moayedi caused MM Mercer Kensington—an instrumentality of the Centurion Enterprise—

to send via certified mail a fraudulent force majeure notice to Megatel.  That force majeure notice claimed that Moayedi was unable to commence work upon the land because of unsuitable weather conditions.  That representation was false and fraudulent because Moayedi had not even begun efforts to develop the land; as such, any delay was attributable to his own neglect rather than to inclement weather. Moayedi's intent in making this representation was to fraudulently induce Megatel to forgo their contractually guaranteed right to terminate upon Moayedi's default.

jj.     Mercer Crossing – Kensington Predicate Act 3 – On July 16, 2019, Moayedi caused MM Mercer Kensington to send via certified mail a second fraudulent force majeure notice to Megatel.  That notice fraudulently claimed delays allegedly attributable to weather.  That representation was false and fraudulent because, rather than being attributable to weather, the delays were solely attributable to Moayedi's own deliberate failure to commence development in a timely fashion. Moayedi's intent in making this representation was to fraudulently induce Megatel to forgo their contractually guaranteed right to terminate upon Moayedi's default.

kk.     Windhaven Predicate Act 1– On or about March 1, 2017, Moayedi caused Centurion's contractors to represent to Megatel Homes III that substantial completion of various lots had been achieved and that geological reports indicated that the potential for vertical rise ("PVR") on the allegedly completed lots was within mandatory design parameters.  These representations were false because, at the time they were made, the PVR on the allegedly completed lots actually exceeded the mandatory design parameters and Centurion's contractors, at Centurion's insistence, falsified geological reports to indicate that the PVR levels

were acceptable when they were not.  Moayedi's intention in making these false representations was to induce Megatel III into purchasing the various lots on which Centurion and its successor-in-interest falsely claimed substantial completion had been achieved.

ll.   Verandah Predicate Act 1– On or about May 5, 2017, Moayedi caused One Verandah, LP--an instrumentality of the Centurion Enterprise—to enter into the Verandah Contract with Megatel Homes III.  The contract, as amended provided for the takedown of 75 residential lots by Megatel and another builder pursuant to a "Lot Split", of which Megatel would select 25.  When the date for completion arrived, the Lots were not ready, but in an effort to further fraudulently retain the earnest money and avoid paying over $500,000 in liquidated damages, Moayedi informed Megatel that he would not honor the Lot Split and instead falsely represented that Megatel was obligated to take down lots at Moayedi's choosing in an adjacent development that was not contemplated in the original contract documents.  Megatel terminated the contract and demanded a return of its earnest money and contract damages, which Moayedi refused.

mm.  Little Elm Predicate Act 1 – On or about January 29, 2012 Megatel identified a plot of land in Little Elm and spent significant resources conducting due diligence and obtaining zoning approvals.  Megatel purchased the Little Elm land from its owner and simultaneously sold it to Centurion in reliance on Moayedi's promise that Centurion would develop lots on the land and, in turn, sell those lots to Megatel.  Centurion borrowed $5.5 million from UDF to finance this purchase.  Megatel refunded approximately $500,000 of the purchase price to Centurion to finance

development costs. Moayedi promised that Centurion would credit this $500,000 toward Megatel's earnest money obligation when Megatel ultimately purchased finished lots on the land from Centurion for $65,000 average per lot. Moayedi never intended to perform as promised. Centurion leveraged the increase in land value to take on significant debt from UDF, which was collateralized by the land. However, since any sale of lots developed from the land would need to pay down this debt burden, Megatel would not be able to purchase any lots from Centurion for a low enough amount to make them profitable, and certainly more than the promised $65,000 per lot. Thus Centurion simply refused to pursue the promised deal with Megatel while fraudulently retaining the improvements generated by Megatel and Megatel's deposit.

36.     These predicate acts are all related in that each was committed by or at the direction of Moayedi, targeted Megatel, and facilitated the overall fraudulent scheme.

37.     These predicate acts stretched over years, harmed multiple victims, and pose a threat of continuing criminal conduct.

## VIII.   FRAUDULENT CONCEALMENT/DISCOVERY

38.     As set forth herein, the defendants engaged in a persistent and protracted pattern of fraud to conceal the overall fraudulent scheme and other misconduct. Moreover, defendants repeated and continuing fraudulent acts were self-concealing. The defendants' repeated and continuing fraudulent acts were designed to, and did in fact, prevent Megatel from discovering the facts that form the basis of its claims herein, despite Megatel's exercise of reasonable diligence.

## IX.    CAUSES OF ACTION

### First Claim
### RICO § 1962(a)

39.     Megatel incorporates by reference Paragraphs 1-38 above as if set forth fully here.

40.     This claim is against Moayedi.

41.     The Centurion Enterprise is an enterprise engaged in and whose activities affect interstate commerce.

42.     Moayedi used and invested income derived from the above-described pattern of racketeering in the Centurion Enterprise.  By way of example, fraudulently obtained earnest money was diverted from development projects into the Centurion Enterprise.

43.     As a direct, contemporaneous, and proximate result of Moayedi's racketeering acts and violation of 18 U.S.C. § 1962(a), Megatel was injured in its business and property.  Megatel is entitled to recover treble damages as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

### Second Claim
### RICO § 1962(b)

44.     Megatel incorporates by reference Paragraphs 1-43 above as if set forth fully here.

45.     This claim is against Moayedi.

46.     The Centurion Enterprise is an enterprise engaged in and whose activities affect interstate commerce.

47.     Moayedi acquired and maintained interests in and control of the Centurion Enterprise through the above-described pattern of racketeering.  By way of example, fraudulently obtained earnest money was diverted from development projects into the Centurion Enterprise.

48.     As a direct, contemporaneous, and proximate result of Moayedi's racketeering acts and violation of 18 U.S.C. § 1962(b), Megatel was injured in its business and property. Megatel is entitled to recover treble damages as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**Third Claim**
**RICO § 1962(c)**

49.     Megatel incorporates by reference Paragraphs 1-48 above as if set forth fully here.

50.     This claim is against Moayedi.

51.     The Centurion Enterprise is an enterprise engaged in and whose activities affect interstate commerce.  Moayedi is employed by and/or associated with the enterprise.

52.     Moayedi conducted and participated in the conduct of the Centurion Enterprise's affairs through the above-described pattern of racketeering and for the purpose of intentionally defrauding Megatel.  By way of example, Moayedi made multiple false statements and omissions, forged and backdated documents, and looted public project funding.

53.     As a direct, contemporaneous, and proximate result of Moayedi's racketeering acts and violation of 18 U.S.C. § 1962(c), Megatel was injured in its business and property.  Megatel is entitled to recover treble damages as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**Fourth Claim**
**RICO § 1962(d)**

54.     Megatel incorporates by reference Paragraphs 1-53 above as if set forth fully here.

55.     This claim is against UDF, Moayedi, Greenlaw, Etter, Wissink, and Jester.

56.     UDF, Moayedi, Greenlaw, Etter, Wissink, and Jester participated in weekly meetings and were in constant contact regarding the above-described pattern of racketeering, and

agreed to facilitate the operation of the Centurion Enterprise through the above-described pattern of racketeering and for the purpose of defrauding Megatel.  Among other things, UDF and its principals facilitated the above-described pattern of racketeering by orchestrating the diversion of funds from Megatel projects, directing Moayedi to use loans from newer UDF funds to repay loans from older UDF funds, and failing to enforce personal guarantees and other rights against Moayedi to prevent the collapse of the Centurion Enterprise and to enable him to perpetrate the above-described pattern of fraud against Megatel.

57.     UDF, Moayedi, Greenlaw, Etter, Wissink, and Jester agreed that Moayedi would commit at least two of above-described predicate acts.

58.     As a direct, contemporaneous, and proximate result of Moayedi's racketeering acts, Megatel was injured in its business and property.  Megatel is entitled to recover treble damages as well as its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**Fifth Claim**
**Common Law Fraud/Fraudulent Inducement**

59.     Megatel incorporates by reference Paragraphs 1-58 above as if set forth fully here.

60.     As detailed above, Moayedi, directly and through entities he controlled, made numerous false material representations to Megatel.

61.     At the time Moayedi made these representations, he either knew they were false or made them recklessly, as positive assertions, without knowledge of their truth.

62.     Moayedi made these false representations to Megatel with the intent that Megatel would act on them and to induce Megatel to enter into various contracts and amendments and forego various rights as detailed herein.

63.     Megatel reasonably relied on Moayedi's false representations and suffered injury as a result.  In addition to its actual damages, Megatel is entitled to recover exemplary damages

under Chapter 41 of the Texas Civil Practice & Remedies Code because its harm resulted from Moayedi's fraud, malice, and/or gross negligence.

## Sixth Claim
## Statutory Fraud

64.     Megatel incorporates by reference Paragraphs 1-63 above as if set forth fully here.

65.     As detailed above, Moayedi, directly and through entities he controlled, made numerous false representations of material fact and material false promises to Megatel in connection with transactions involving real estate.

66.     Moayedi made these false representations and promises for the purpose of inducing Megatel to enter into various real estate contracts and amendments.  In addition, Moayedi made these material false promises with the intention of not fulfilling them.

67.     Megatel reasonably relied on Moayedi's false representations and promises by entering into various real estate contracts and amendments and by foregoing various rights as detailed herein, and suffered damages as a result.

68.     Megatel is entitled to recover its actual damages as well as exemplary damages and reasonable attorneys' fees and costs under Texas Business & Commerce Code § 27.01.

## Seventh Claim
## Aiding and Abetting Fraud

69.     Megatel incorporates by reference Paragraphs 1-68 as if set forth fully here.

70.     As detailed herein, over the course of several years, Moayedi repeatedly defrauded Megatel.

71.     UDF, Greenlaw, Etter, Wissink, and Jester knew Moayedi was repeatedly defrauding Megatel, intended to assist Moayedi in committing the various fraudulent acts detailed

herein, and did in fact provide Moayedi assistance and encouragement in connection with Moayedi's fraudulent scheme.

72.     UDF's, Greenlaw's, Etter's, Wissink's, and Jester's assistance or encouragement was a substantial factor in causing Megatel's damages from Moayedi's pervasive and persistent fraud.

## X.     JURY DEMAND

73.     Megatel demands a jury trial of its claims and has tendered the requisite jury fee with the filing of this Original Complaint.

## XI.     PRAYER FOR RELIEF

74.     Megatel respectfully requests that the defendants be summoned to appear, and following a jury trial of Megatel's claims, that judgment be entered in Megatel's favor for all damages alleged herein, including treble actual damages and exemplary damages, reasonable attorneys' fees and costs, and such other and further relief, at law or in equity, to which Megatel may show itself justly entitled.

Dated: March 20, 2020                    Respectfully submitted,

                                         BARNES & THORNBURG LLP

                                         By:     */s/ Randy D. Gordon*
                                                 Randy D. Gordon
                                                 State Bar No. 00797838
                                                 RGordon@btlaw.com
                                                 Victor Vital
                                                 State Bar No. 00794798
                                                 vvital@btlaw.com
                                                 Lucas C. Wohlford
                                                 State Bar No. 24070871
                                                 lwohlford@btlaw.com
                                                 2121 North Pearl Street, Suite 700
                                                 Dallas, Texas 75201
                                                 Telephone:  (214) 258-4200
                                                 Facsimile:  (214) 258-4199
                                                 ***ATTORNEYS FOR PLAINTIFFS***